STURDY *v.* HALL, SECRETARY OF STATE.

4-6964                                    164 S. W. 2d 884

Opinion delivered October 12, 1942.

*Charles W. Mehaffy* and *Ed I. McKinley, Jr.,* for petitioner.

*J. S. Abercrombie, Edward H. Coulter* and *Tom F. Digby,* for respondent.

HOLT, J. On and prior to July 3, 1942, there was filed with the Secretary of State a petition made up of a large number of parts which contained the names of 27,194 signers. This petition was in support of proposed Initiated Act No. 1 which its sponsors refer to as the "Local Option Act."

The Secretary of State found, and declared, that the ballot title to the proposed act was sufficient and that the requisite number of signers appeared on the petition to entitle said act No. 1 to be placed on the ballot to be voted upon at the general election to be held November 3, 1942. Immediately after the ruling of the Secretary of State on the petition, plaintiff here made a check of the signatures appearing on the various parts of the petition, and on September 5, 1942, filed complaint in this court in which he questioned the sufficiency of the ballot title to the proposed act, and further alleged that the petition does not contain the names of the requisite number of legally qualified electors.

It is contended by plaintiff and not denied by defendants that the petition must contain the genuine signatures of at least 16,192 qualified electors before the act in question may be voted upon, and that if as many as 11,003 illegal signatures appear on the petition then it would be insufficient. Plaintiff has furnished us with a tabulation in which there are grouped and classified the challenged signatures appearing on the petition. Plaintiff claims that 79 signatures do not correspond with the certificate; that 264 are duplicates; 72 ineligible, scratched out or not certified; 224 have been "tampered with"; that 3,680 had no poll tax; that signatures of 792 were not properly witnessed by the circulator; that 10,752 appear on parts of the petition on which two or more names appear in similar handwriting and that a total of 15,838 illegal names appear upon the petition.

We proceed first to consider the sufficiency of the ballot title which reads as follows: "An Act to Amend the Liquor Laws of the State of Arkansas so as to Provide for Better Local Option Laws for Prohibiting the Manufacture or Sale or the Bartering, Loaning or Giving

Away of Intoxicating Liquors; for Defining Intoxicating Liquors; for Fixing Penalties for the Violation of the Law in Territory Made Dry Under the Provisions of this Act; and for Other Purposes."

This court has many times had occasion to discuss the sufficiency of ballot titles and has consistently followed the general rule announced in *Westbrook* v. *McDonald,* 184 Ark. 740, 43 S. W. 2d 356, 44 S. W. 2d 331, wherein it is said: "The ballot title should be complete enough to convey an intelligible idea of the scope and import of the proposed law and that it ought to be free from any misleading tendency, whether of amplification, or omission, or of fallacy, and that it must contain no partisan coloring." No hard and fast rule as a guide has been announced by this court. We have held that an abstract or synopsis of the act is not essential in the ballot title, and that the provisions of amendment No. 7 referring to ballot titles should always be liberally construed.

In the comparatively recent case of *Newton* v. *Hall,* 196 Ark. 929, 120 S. W. 2d 364, this question was gone into rather extensively, and after considering many of our own cases, as well as cases from other jurisdictions, we there said: "In the opinion (referring to the case of *Coleman* v. *Sherrill,* 189 Ark. 843, 75 S. W. 2d 248), in which all the judges concurred, we held that the provisions of amendment No. 7, with reference to ballot titles, should be liberally construed, and that the ballot title was sufficient. In so holding we said: 'It may be observed that if the ballot title were intended to be so elaborate as to set forth all the details of the act, the publication, or advertisement, might, for that very obvious reason, be omitted. Perhaps no set rule or formula can be announced as to what a ballot title shall contain, but it may be safely stated that, if it shall identify the proposed act and shall fairly allege the general purposes thereof, it is sufficient.' That case quoted the language of Chief Justice McSHERRY of the court of appeals of Maryland in the case of *Mayor of City of Baltimore* v. *Stewart,* 92 Md. 535, 48 Atl. 165, as follows: 'It has never been understood that the title of a statute should dis-

close the details embodied in the act. It is intended simply to indicate the subject to which the statute relates. . . . When the general subject is indicated, no detail matters need be mentioned in the title.' "

In the ballot title before us it is clear and certain that it is proposed to amend the local option laws on the subject of prohibiting the manufacture, sale or the bartering, loaning or giving away of intoxicating liquors and to provide penalties for the violation of the law in territory made dry under the provisions of the act. This we think is sufficient. The details of the act need not be recited as its general purpose is clearly stated.

## 2.

We come now to a consideration of the sufficiency of the number of qualified signers on the petition. It is conceded that *prima facie* the petition contains 11,003 more signatures than is required to initiate the act. This excess is such as to make it unnecessary to consider such questions as that persons who had not paid their poll tax and therefore not qualified electors had signed the petition. All signatures questioned by plaintiff for this and other reasons bearing upon the qualifications of the **signers of** the petition may be stricken and a sufficient number of signers remain to initiate the act. As we view **it, there** is only one theory upon which plaintiff may be awarded the relief prayed and the submission of the act to the electorate enjoined and that is this—a handwriting **expert,** whose testimony is undisputed, stated that he had examined all of the parts of the petition and gave the names, petition numbers and signature line numbers of certain signers which were in the handwriting of persons who had signed other names. He testified to a total number of 10,381 names appearing on different parts of the petition, and that some of these names were in the same handwriting. This does not mean, however, that one person wrote all of these 10,381 names. That would be a fraud too obvious for doubt. But it means that different persons had written more than one signature on parts of the petition and that those names so written,

together with all other names on these parts, total 10,381. The objection to counting any of these signatures is that they appear on parts of the petition verified by affidavits of the circulators and that these names being false, since they were not the signatures of the persons whose names appeared, voided all the names on the parts of the petition where these names appear. In more than 100 instances the names would apparently be that of husband and wife as John Smith and Mrs. John Smith. In other instances, according to this handwriting expert, one person had written more than one name.

Plaintiff argues here that all of the names on the parts of the petition containing such names should be stricken for the reason that the affidavit of the circulator is false. It is conceded that if this be done enough names will not remain to authorize the submission of the act. In support of this contention plaintiff strongly relies upon the opinions of this court in the cases of *Hargis* v. *Hall*, 196 Ark. 878, 120 S. W. 2d 335, and *Sturdy* v. *Hall*, 201 Ark. 38, 143 S. W. 2d 547, and especially the latter case. Both of these opinions are to the effect that each petitioner must sign his own name and that no signature may be counted unless signed by the petitioner himself. But the question before us is what is the effect upon a petition containing signatures not signed by the petitioners whose names appear on the petition. Must the entire petition be disregarded, or is it required only to strike out the particular improper signature? The answer to this question must depend upon whether the circulator of the parts of the petition was guilty of fraud in permitting this to be done. In *Sturdy* v. *Hall, supra,* the circulator was likened to an official holding an election. We there said that if it were shown only that an irregular vote had been cast it was required only that such vote be excluded, but that if the fraud were permitted by the election officer, or with his knowledge and connivance, then the signature of the election officer as to the result of the election would be disregarded as unworthy of belief. The election certificate would have lost its *prima facie* verity and only those votes would be counted which were shown by testimony *aliunde* to have been legal and

proper. So in the instant case persons wrongfully signing may not be counted and must be excluded, but only such names should be excluded and not counted unless it appears that the circulator was a party to the fraud of procuring illegal and improper signatures. This would not be true under the laws of the state of South Dakota, shown by the opinion of the Supreme Court of that state in the case of *Milford* v. *Pyle,* 53 S. D. 356, 220 N. W. 907, cited and quoted from in our case of *Sturdy* v. *Hall, supra,* and strongly relied upon by plaintiff here. This is true because as stated in the South Dakota case ''where a person circulates a referendum petition (and the rule is not different in the case of petitions to initiate an act) it is his duty to see and personally know every person who signs it. Unless he does know them and see them all sign he can not honestly say that he is acquainted with each signer and that each of them signed it personally and that each of them added to his signature his place of residence, his business, his post office address and the date of signing'' and that ''when a person not knowing these facts makes the affidavit above set out such affidavit is false and must be knowingly false and all the names on such petition must be rejected.''

But our amendment does not impose these strict requirements upon the circulators of petitions in this state as it is required only that ''each part to the petition shall have attached thereto the affidavit of the person circulating the same that all signatures thereon were made in the presence of the affiant and that to the best of the affiant's knowledge and belief each signature is genuine, and that the person signing is a legal voter, and no other affidavit or verification shall be required to establish the genuineness of such signatures,'' that is to give them *prima facie* that effect. In *Sturdy* v. *Hall, supra,* we said: ''. . . there is no explanation, or attempt to explain, by the circulators who have made false affidavits that signatures were genuine, and, certainly, it must be presumed, at least in the absence of any explanation to the contrary, that a person who made an affidavit that certain statements were true did so intentionally.''

In the instant case we are faced with no such situation, for petitioner says: "At the outset . . . [we] . . . express regret over the fact that it was necessary . . . to show that many instances of *irregularities* occurred in the petitions. The instances were so numerous that they could not be overlooked. Yet (petitioner) is not urging these irregularities as indicating any criminal intention of the parties responsible therefor to willfully violate the law. Rather, the (petitioner) is of the opinion that the responsible parties were motivated by overzealousness."

In *Hargis* v. *Hall*, 196 Ark. 878, 120 S. W. 2d 335, we held that certain provisions of the enabling act of June 30, 1911, had not been repealed, the unrepealed portion being: "Any person signing any name other than his own to (an initiated petition), or who shall knowingly sign his name more than once for the same measure at any one election, or who shall sign such petition when he is not a legal voter, . . . shall be guilty of a felony, and shall be imprisoned in the state penitentiary for not less than one year nor more than five years."

The preceding section deals with *signers* of petitions, as distinguished from *circulators*. But certainly, if one circulating part of a petition fraudulently signs a name, or if without authority he signs some one's name, there is active fraud, involving forgery, and a crime has been committed.

But petitioners say the transactions complained of were mere irregularities induced by overzealousness, and that no crime was committed. If there were no willful violation of the law by those who circulated the petitions, then it cannot be said that an occasional duplication of names nullifies the entire sheet upon which a long list of electors had in good faith petitioned for submission of the question at issue.

Now it may be conceded that undisputed testimony establishes the fact that names appear on the petition not signed by the party whose name appears; but if this were not done with the wrongful intent and with connivance between the signer and the circulator, we think

only the particular name wrongfully signed should be stricken and not all the names appearing on that petition.

If this rule is adopted, and we adopt it, there remains on the parts of the petition, collectively considered, a sufficient number of names to require the submission of the act to the electorate. The prayer of plaintiff's complaint is denied.

SMITH, MEHAFFY and McHANEY, JJ., dissent.

SMITH, J., dissenting. The I. & R. Amendment was designed as a prod when the General Assembly is inert, and as a restraint when it is thought the General Assembly has been improvident; but its great and useful powers may be abused unless the persons seeking to invoke its powers are required to comply with its provisions regulating the conditions under which these powers may be employed.

It was pointed out in the opinion in the case of *Sturdy* v. *Hall, Secretary of State,* 201 Ark. 38, 143 S. W. 2d 547, that slightly more than one-half of one per cent. of the State's population may initiate an Act, and that slightly less than one-half of one per cent. may arrest legislation passed by the General Assembly through the referendum power, and that less than one per cent. may propose constitutional amendments. It was there pointed out that there was no limitation upon the number of Acts which might be initiated, nor upon the number of legislative Acts which might be referred, nor upon the number of constitutional amendments which might be proposed, and that it was, therefore, possible for this small per cent. of our population to assemble the electorate of the State at each election into a legislative assembly, and at the same time as a constitutional convention.

At the 1936 general election, three constitutional amendments were submitted. This number was increased to nine at the 1938 general election, and there were seven at the 1940 election. At these three elections, nineteen amendments to the constitution were proposed, to say nothing of numerous legislative acts initiated and referred. The practice of disregarding the General Assem-

bly is growing. The General Assembly meets every two years, and has the power to propose as many as three constitutional amendments, and may pass an indefinite number of acts after bills therefor have been considered and debated in each house and have been subject to amendment in both houses. The elector has five minutes in the election booth in which to vote upon all the questions there submitted and the various candidates for office. Section 4770, Pope's Digest. It was, therefore, said in the Sturdy case, *supra,* that "The law must, therefore, be, and is, that if a power so great may be exercised by a number so small, a substantial compliance with the provisions of the constitution conferring these powers should be required."

These powers may be exercised only by the qualified electors of the state. The I. & R. Amendment expressly so provides, and each elector must act for himself, and not for or through another, and he acts by signing a petition for the submission of a constitutional amendment or the initiation of a legislative act or for the reference of a legislative act.

We said in the case of *Hargis* v. *Hall, Secretary of State,* 196 Ark. 878, 120 S. W. 2d 335, that "The amendment contemplates that signatures must be genuine. That purpose is so expressed. By the amendment's terms, laws may be enacted 'prohibiting and penalizing perjury, forgery, and all other felonies *or other fraudulent practices* in the securing of signatures or filing of petitions.' The amendment repealed such parts of the act of 1911 as were in conflict with its purposes; but, as Judge Hart has so clearly stated, the use of language in Amendment No. 7 entirely repealing the former amendment, but limiting repeal of the statute of 1911 to such portions as were in conflict with Amendment No. 7, is conclusive of the proposition that those who wrote the new amendment recognized certain values in the act of 1911, and that it was their purpose to utilize these values in administering the amendment. We hold, therefore, that the statutory inhibition against a person signing any name other than his or her own to an initiative petition is not in conflict with or repugnant to Amendment No. 7,

and it was not repealed. But even without such statute, we think the amendment, by its own terms, contemplated that the genuine signature of electors be procured.''

This holding was expressly reaffirmed in the Sturdy case, *supra,* where we said: ''The circulator of a petition is of the nature of an election official. The elector directs, by signing the petition, that the proposed act shall be submitted to the people, and he must sign his own name, as held in *Hargis* v. *Hall, supra,* and he must do so in the presence of the circulator of the petition, in order that the circulator may truthfully make the affidavit required by both the constitution and the statute. In many instances no one is present except the circulator of the petition and the signer, and when the circulator makes the required affidavit, the *prima facie* showing has been made that the elector signed the petition.''

No one has any more right to sign the name of another to one of these petitions than he would have to vote for that other person at any election, and if he does so he commits an illegal act, however fully authorized his action may have been by the person for whom he signed or for whom he voted.

It is conceded that there are several thousand names on these petitions in the instant case which, under the undisputed testimony in the case, may not be counted. The largest number of this group consists in the signatures of persons who are not qualified electors, through failure to pay poll tax, and there are 3,680 names in this group alone. But if all these are stricken from the petitions, there remains the requisite number of signers, provided all the remaining names are counted.

But it further appears from the testimony without dispute that there are 210 names on the various petitions written by some one who had signed some other name.

In a majority, but not in all of these cases, a husband had apparently signed his wife's name, or a wife had signed her husband's name. These signatures are unauthorized, because each person must sign his or her own name. Now, merely striking these names would still leave the requisite number of signers; but it is insisted that

all names on all petitions in which these wrongful signatures appear must be stricken for reasons later to be discussed. It is conceded that if this be done, the petitions do not contain the requisite number of signers. The controlling question in the case is, therefore, whether all these names shall be stricken.

In the Sturdy case, *supra,* we stated the rule announced by textwriters, and approved by the decisions of this court, there cited, applicable to election contests. It is to the following effect. If one casts an illegal or fraudulent ballot, his fraud vitiates his own ballot only, unless it be shown that the election officials connived at and were parties to such fraudulent voting, in which latter event the certificate of the election officials as to the result of the election is without verity and will be disregarded, "even though the fraud discovered is not, of itself, sufficient to affect the result." The reason for this rule, as stated by Judge McCrary, in his great work on Election, (4th Ed.) § 574, which this court has approved in the cases cited in the Sturdy case, *supra,* being ". . . that an officer who betrays his trust in one instance is shown to be capable of the infamy of defrauding the electors, and his certificate is, therefore, good for nothing."

We said in the Sturdy case, *supra,* that where the circulator of a petition, who is the sole election officer, is shown to have made a false affidavit, the petition to which that affidavit is attached has lost its *prima facie* verity, and in such case no names could be counted appearing on this petition to which a false affidavit was attached, unless it were otherwise shown that there were valid signatures on the petition.

This must necessarily be true if the mandatory provisions of the constitution and its enabling act designed to prevent fraud are to be given effect.

Now, it must be remembered, as was said in the Sturdy case, *supra,* that "The I. & R. Amendment provides that 'No law shall be passed to prohibit any person or persons from giving or receiving compensation for circulating petitions.' That compensation would be a

matter of agreement between the contracting parties, and might, in some instances, although not in the present case, be based upon the number of signers obtained, and the law must be declared as it should be applied in any case. There would, therefore, be a constant temptation for the circulator of petitions to increase his compensation by loose practices in obtaining signatures. The constitution contemplated this possibility, and attempted to guard against its consequences."

It is insisted in the brief for defendant, and was strongly urged in the oral argument before the court, that the parties here are among the state's best citizens, and are endeavoring to promote public morality. This is conceded; but the same rule must be applied here that would be applied to an act initiated by a group less disinterested.

Section 13289, Pope's Digest, reads as follows: "Each and every sheet of every such petition containing the signatures shall be verified on the back thereof in substantially the following form, by the person who circulated said sheet of said petition by his or her affidavit thereon as a part thereof:

"State of Arkansas,

"County of...................................................

"I,...................................................., being first duly sworn, state that (here shall be legibly written or printed the names of the signers of the sheet) signed this sheet of the foregoing petition, and each of them signed his name thereunto in my presence. I believe that each has stated his name, residence, postoffice address and voting precinct correctly, and that each signer is a legal voter of the State of Arkansas, ................................... county, or city or incorporated town of................................... .

"Signature...................................P. O....................................

"Subscribed and sworn to before me this the.................... day of...................................., 19............ .

"Signature...................................P. O....................................

"Clerk, Notary Public, or J. P.

"Forms herein given are not mandatory, and if substantially followed in any petition it shall be sufficient, disregarding clerical and merely technical errors."

It thus appears that the law requires the circulator to make affidavit that each petitioner signed his own name, and did so in the presence of the circulator. If, therefore, the circulator makes this affidavit after permitting one person to sign the name of another, he has made a false affidavit, however innocent his intention, and as was said in the Sturdy case, *supra,* such a petition loses the presumption of verity, and all the names appearing on such a petition would be stricken unless it were otherwise shown that certain signatures on the petition were valid and should be counted; but there is no such proof in this case. We cited in the Sturdy case, *supra,* opinions from the courts of other jurisdictions so holding.

Defendant's brief assails that opinion, especially with reference to our quotation from the case of *Morford* v. *Pyle, Secretary of State,* 53 S. Dak. 356, 220 N. W. 907.

It is insisted by defendant that the South Dakota opinion was based upon a statute unlike § 13289, Pope's Digest, above quoted, in that the South Dakota statute requires a fuller certificate to be verified by the circulator of the petition than does our own statute, and requires the circulator to swear that the facts contained in his certificate are true, and not merely that he believes them to be true.

An analysis of our statute will show, however, that upon the vital point here at issue, our statute is not unlike that of South Dakota. Our statute requires the circulator to state only that "I believe that each has stated his name, residence, postoffice address and voting precinct correctly, and that each signer is a legal voter of the State of Arkansas, . . ."

Concerning these facts just mentioned the circulator may state his belief that the signer gave his name, residence, postoffice address and voting precinct correctly, as he would have to depend upon the signer for this information. But whether each signer had personally

signed, and had done so in his presence, is a fact which he personally knows and does not depend upon information derived from the signer. The circulator is required to swear as a fact that the petitioner signed in his presence. He knows whether this is true or not, and however good his intentions may have been he committed a fraud in law when he swore to a fact not true. An affidavit conforming to § 13289, Pope's Digest, appears as a part of each and all of the petitions filed in this cause. It will be observed that the affidavit is divided into two parts, and that a period separates the parts. In the first part the circulator is required to swear that the signer signed in his presence. A period completes that sentence, following which the circulator is permitted to swear that he believes that the signer stated his name, residence, postoffice address and voting precinct correctly. There is, therefore, no difference in essential respects between our statute and that of South Dakota, and the opinion of that court as to the effect of a false affidavit is applicable here, that effect being that all the names appearing upon a petition supported by a false affidavit must be stricken, and may not be counted.

The effect of these views is that the petitions do not contain enough names which may be counted to require the submission of the proposed act, and the writ of prohibition prayed should be granted.

I am authorized to say that Justices MEHAFFY and McHANEY concur in the views here expressed.